Peck, J.
The point which arises in this cause on that part of the judge’s charge which relates to the Indian’s intention to remove, having received so full a consideration in the opinion of Judge Green, I deem it needless to add any thing further upon it; in the result upon that question I heartily concur.
But upon the other point discussed in the opinion, the necessity of an actual possession by the Indian taking a reserve on the 1st of January, 1820, I am constrained to differ!
The liberal construction which in my opinion ought to be given to the treaty in favor of him who was to take by it, forbids that so much strictness should be required. Assuming, therefore, that the 1st Jan. 1820, was the period when the great change in the nation was to be effected, one portion of the Cherokees were to depart to a country west of the Mississippi, another portion over the line of separation fixed in the treaty, and thence forth to become the boundary between the white man and the remaining nation this side of the river Mississippi; at a moment too, when the clause in the treaty which kept off the intruding white man, ceased to be operative; at this moment when all others were in restless commotion, the reservee is the only one who, in the exercise of a sober and unmoved philosophy, is to be found in his domicil with his witness at hand to establish the fact that being there he had not removed, and by his possession his title had vested.
As the treaty provided upon its face in article 12th, against intrusion by the whites, up to the end of this day, where was the necessity for a strictness so searching?
The Indian taking a reserve had given sufficient evidence of earnest and sincerity of purpose; he had. made the entry of his name with the agent; he had fixed his *52 right of record at the place appointed; he expected his rights to commence as a citizen of the United states, and he is promised the same protection which is afforded to the citizen.
It is really going too far to say that mere absence is removal; I cannot bring my mind to contemplate it seriously. Some of the members of this court and myself for one, have said, that under the broad terms of the-treaty, “to each and every head of an Indian family the United States give,” &c. that a state of things might exist where many resided in towns and villages. That really the Indian on the 1st day of January, 1820, had no domicil upon the land described in his entry, and therefore, in the view taken of the case before us, loses all the benefits conferred by the treaty for not being in his domicil, having none upon the land, he was, according to the construction given, a wild man, removing and abandoning his lands.
If it be true (and it comes from high authority) that the Indians are a people in a domestic relation and in a state of pupilage under the United States, it would seem to follow that in his case, which was a new one, some grain of allowance should be thrown in the scale in his favor. In the figurative language applied to him, we are to suppose that he has just arrived at man’s estate; just emerged from the savage to the civilized man; he by a rigid rule of law, not applicable to other citizens touching their rights, is to know his Latin, pedis possessio, and act up to it or suffer a forfeiture. Now as he could not learn this from the condition of the other white men touching their estates in parallel cases,* and as it was not on the face of his cowbala, but a matter of subsequent construction by the learned Judge, it looks like hardship when fourteen years afterwards he is to hear for the first time, that his whole right depended upon the single fact where he had made moccasin tracks on the 1st day of January, 1820. Now, while I *53 ¡am bound to admit that on the day spoken of he could not anticipate exactly how the members of the court would be divided on this turning point of his cause, still it is a fair presumption in his favor to which Í may resort, that he, the Indian, was well read in the law of nations, and that he knew the rule was, that all construct.i'on under treaties shall be in favor of the right, and not against it, and that construction shall not prevail to work forfeiture or defeat right. Vattel, 303.
He had paid as valuable a consideration for his land as the white man had paid for his warrant; the warrant holder makes his designation, and though he never saw the land, his right is fixed against the world, even though his entry be no more formal or special than the Indian’s now before us. The analogies of law prove something, and if the Indian is presumed to have considered of them, he would think that out of his own land and country he might be permitted to carve his right with a certainty equal to that pursued by the white man when he took his land from him; he would say that the white man's cowhala. (paper) from North Carolina was not better than his cowhala from the United States, and being equal and both citizens, as he was the first in time he was best in right.
But ag'ain he is told that possession by his tenants will not do; his answer is, it would do with the white man, and as now, I am a citizen, why not with me? We compel him to know the law, and therefore are bound to presume that he understood'and practised upon the maxim, qui jac.it per alium facit per se, and fourteen years after he has conformed to it, the maxim is found too narrow to cover his case. The right he held in common with his nation up.to the 1st January, will not avail him, because Indian law that moment passed off with the removing portion of his tribe. Parallel cases among the whites, do not, we are told, apply to his peculiar case, and what is the reason? Was it designed that there *54 should be found somewhere in the treaty a blight destructive of his rights, not in letter, but in construction? If it was possible to find it, which I deny, it would be the •first duty of the judge to preyent its influence.
But it is said that this construction necessarily follows, from what has already been decided by the court. For my part I am willing to put the question upon the list of examination; liberality of construction in favor of the right, has been constantly kept in view by a majority of the members of this court.
These were the facts looked to; has the Indian all along acted in view of his rights? do we see a constant declaration of intention written and verbal? he has never before been met with the enquiry, “where was your foot on the 1st day of January, 1820?”
Who can help that if this was the enquiry, that perjury might destroy his hopes, without the possibility of his being able to meet and resist it? If affection for his departing friends had led him “to the light canoe” about to depart, he must be told the right is forfeited, and though his tenant in possession speak for him, he is answered, “you have abandoned, and now your return cannot save you.”
Who are his jurors to weigh testimony? who his judges to speak the law? who the witnesses that may declare in his case? If a remnant of his countrymen remained around him, they are as jurors, judges or witnesses cut off from participation in his case. These things, whether from policy or not, existing, are arguments irresistibly strong against the construction contended for. To place him upon an isthmus so narrow, would be to destroy him. The wave had borne his own people to the West, but the wave of white population from the East, pledged to sustain him, in its mighty sweep removes the footstep trace of the last day, and all is lost.
As there was no want of intention, ho neglect of form *55 ality whieli the reason of the case required, who was injured by his .absence from the spot on the given day? None had conflicting rights to lose, and the high contracting parties are content.
One of the old pleas upon which Indians were made to lose their lands, was the want of divisions into seve-ralty that which was held in common, the latter being a mark of the savage state; and savages having no rights the civilized man seized upon the estate thus forfeited. We^o not, it is true, act in this case upon that rule, but the attempt is to introduce another quite as unreasonable and equally fatal to the right, the unreasonableness of which arises from the fact that is made to apply to his own peculiar case, inconsistent with the rules of outlaw.
In the constitution of Tennessee, (Bill of Eights, sec. 31,) it is provided, that the people residing south of French Broad and Holston, &c. are entitled to the right of occupancy and preemption on that tract. In construing this clause, the courts have held the occupant to the date of the constitution, 6th February, 1796, but it never was pretended that occupation by a tenant would be insufficient, nor in that case was it required to show the pedis possessions on the day; a house or enclosed land and such obvious marks as evinced- residence in legal parlance was held sufficient; the common sense would have been shocked at any other view. Now what, let me ask, is the difference of language between the constitution and the treaty? Residing is the term used in the constitution. The occüpant shall have residence on the land on the 6th of February, 1796. I hazard nothing in saying, there are $fo terms in the treaty which can bring the mind to a limit as narrow-as that used in the constitution; even strict construction did not defeat the right of the occupant when circumstanced as the Indian. Yet the latter, whose right ought to receive more favor, *56 ]S by a rigidness of construction, without words on which J . to predicate it, cut out.
The constitution was a declaration of fundamental’ rights where all making and to be bound by it were equal; under this the occupant was to hold, he had paid no consideration, true he was to pay in future, hut he had his choice to abandon. There was no obligation upon him.
The treaty was a solemn compact executed; the Indian paid his consideration, when he signed the instrument, he parted with his country, enlarged the white man’s boundary, and his nation withdrew. Therefore more liberality of construction should be given.to sustain his rights. All however, that is ask.ed for him is to make the constructions the same.
If we are under a confederated union of States capable of making ireaties, let us avow it. If treaties, when made, are the supreme law of the land, say so. And if they are to receive construction, not only as contracts, but with favorable views towards him provided for, let it be so pronounced.
In pronouncing what I understand to be the law, it must be done by me with a regard to established rules, uniform in their operation and unbiassed by a resort to supposed extrinsic circumstances, or seeming necessity for exception.
Green, J.
1st. There is manifest error in that part . of the charge of the court in which the jury are told that if the lessor of the plaintiff was deprived of the possession of his reservation by force, fear, fraud or stratagem, and afterwards came to the determination to expatriate himself from the government of the Unit'ed States, and. not return to the reserved land, and pursue the vocations of civilized life, it would be a forfeiture and defeat a recovery, by the 8th article of the treaty of 1817, and the 2d of the treaty of 1819.
The grant of six hundred and forty acres of land for *57 life, with reversion in fee to the children, and dower to the widow, is made to each head of an Indian family who may comply with the requisites stipulated in said 8th ar-tide. This title, when once vested, was subject to be forfeited by one act, and one alone. That act is specified in the proviso to the said 8th article, in the following words: “Provided, that if any of the heads of families for whom reservations shall be made, should remove therefrom, then, in that case, the right to revert to the United States.” The stipulated act for which a forfeiture was to take place, being a removal from the land reserved, which, according to the plain sense of the treaty, and the uniform adjudication of this court, must be a voluntary removal; it is plain that an involuntary removal, coupled with, or succeeded by, any possible state of the mind, cannot work a forfeiture. If it be assumed, that absence from the reservation, coupled with a mind to abandon the claim, and not to return, are equivalent to a voluntary removal, the reply is: 1st. That we have nothing to do with equivalents; the grantors have stipulated the precise act that shall work the forfeiture, and we have no right to assume that other things are equivalent to that act, and thereby adjudge that a forfeiture has accrued in consequence of a concurrence of facts not stipulated in the treaty, or contemplated by the grantees. But, 2d. The facts contemplated in the charge of the court are not equivalent to a voluntary removal. The charge contemplates the case of a removal by force and fear, and' admits that such removal of itself would not work a forfeiture. Now’ suppose the reservee to be expelled by strong hand, and the exhibition of such violence as to endanger his life; and suppose that being out of possession by such means, he considers it dangerous for him to return, and then forms the determination of abandoning the country and the haunts of civilized man, and that this resolution is communicated to a witness the day after his expulsion, but on being introduced to a lawyer in whom *58 he confides, be is told that he can get his land back; that such removal is no forfeiture of it; and that the laws of the country will protect him from the violence of the people and punish the wrong doers. Now suppose, upon this information, he determines to claim the protection of those laws, and appeals to them for the recovery of his land, would it lie in the mouth of the wrong doer to tell him, and to tell the court, and to prove by the witness, that although he, the reservee, was expelled, although he was in danger of his life, yet he determined the next day to expatriate himself, and that he had therefore forfeited his land; that true, be had not voluntarily removed, but he had done that which was equivalent. Would not such a defence, in such a case, excite the indignation of every honest man? Would it not be a mockery of justice? And yet the case supposed is not dissimilar in principle to that made in the charge of the court. All the difference is, that the injustice of the one is palpable and flagrant; and in the other case, other circumstances were thrown around the cause, so that the legitimate consequences of this charge were not before the mind of the judge. But if in a case like that of M’lntosh or Path-killer, this principle is settled, it must be of universal operation, and may be applied to cases where the determination to abandon the land and remove from the country, although made when the man was out of danger, yet may have resulted from, and been produced by the very act of expulsion which the judge had told the jury would not work a forfeiture. For it is easy to perceive that the ignorant, lone and friendless Indian, upon being expelled by strong hand and in danger of his life, or on being turned out by the sheriff in obedience to the order of the judge, would think in the one case, that the dangers surrounding his situation were such as to make it prudent that he should give up all thought of living among the white people; and in the other, that as the judge had determined against his right, and the sheriff had *59 turned him forcibly from his home, that the laws of a white people were against him, and that any further attempt to maintain his right would be useless, and he had better seek a home among his tribe again. Now shall it be said that while' such expulsion works no forfeiture, such determination, the natural consequence of that expulsion, when coupled with it shall have that effect? Surely such doctrine cannot be maintained. But it is said, suppose he does not return to claim his land for twenty years, shall no length of absence, no manifestation of purpose not to return, forfeit his right? The answer is, no; by force of this treaty nothing can work a forfeiture but a removal from the land. ' Truly, if others get into possession, and hold it adversely for themselves under another title for seven years before he sues, his right is gone, and by force of the statute of limitations is vested in the possessor. But by no other means can he lose his right to recover whenever he may institute his suit.
2d. As the formation of any purpose after he shall have been expelled will not be a forfeiture of the right of a reservee, so neither will any sale of his life estate of part, or all the land reserved, have that effect, provided he remain resident in even the least part of the six hundred and forty acre tract reserved. The object of the government of the United States was, that he should keep his family and raise his children on the land reserved; thus living among the white people, rearing his children under the operation of our government, civilizing them and rendering them respectable, intelligent citizens, when by his death, the fee simple of thé reservation should be thrown upon them. This object would be attained, if he remained with his family on the land and drew his support therefrom. He could not convey more than his life estate, and the treaty does not restrict the free exercise of the right of selling that.- The continued residence being the great object the government *60 sought to secure, the removal was most properly fixed upon as the only act which could forfeit the right. The voluntary removal from the land being the only thing which could work a forfeiture, all proof to show a forfeiture, except as to the fact of such removal, is wholly irrelevant.
3d. But upon the subject of removal, the court told the jury, among other things, that if a reservee were in-’ duced to 'remove through fear, such removal would not forfeit his right. Now, - although in the connection in which this is said, it is rendered probable that the judge had the same view of the case which we,have; yet, as misconceptions may here arise, it may not be amiss to state distinctly the view that we entertain upon this subject. Fear, then, operating to induce a removal which will not work a forfeiture, must be a fear superinduced by some act of others, with a design to effect thereby the reservee’s removal. For if the reservee commit theft or murder, and through fear of the officers of justice, and the penalties of the law, should choose not only to absent himself, but to remove his domicil, surely such a removal, would work a forfeiture. That he was afraid to remain Jest he should receive merited punishment, would not prevent the removal from being voluntary. Some act must, therefore, be done with a view to induce his removal, which destroys his free agency, so that his removal is not voluntary, otherwise such removal will forfeit tfie estate.
4th. It is insisted on the part of the counsel for the plaintiff in error, that the court erred in charging the jury in substance “that to entitle a party claiming a reservation thereto, he must show in addition-to other facts, that he was in possession of the land claimed as a reservation, on the first day of January, 1820, either by himself, his family, servants or tenants.”
That such party must have been in possession on the first day of January, 1820, to entitle him to the land, is *61 the necessary result of the decisions of this court, in the case of Grubbs’ lessee vs. M’Clatchy, (2 Yerger’s Reports, 432,) and of Morgan vs. Fowler, (2 Yerger’s Reports, 450.) These cases determine that each head of an Indian family had, by a fair construction of the treaties, until the first day of.January, 1820, to determine whether he would take a reservation, or remove; and at any period before that time he might register his name for a reservation, and make or select an improvement to be included in the centre thereof. It plainly follows, that whether possessed of any particular’spot before that time or not, would be immaterial, seeing that he had until that time, within which he might change that possession, and select another spot- It equally follows that his possession of the land intended to be held as a reservation, on the first day of January, 1820, was indispensable to the acquisition of title thereto, because as his removal from the reservation is to work a forfeiture, his previous possession of it is presupposed, for he could not remove from a place where he had not resided. His right to the reservation is inseparably connected with his residence on it, unless his removal has been involuntary. As ’ therefore, the right, (if ever acquired,) must have commenced as early as the first of January, 1820, so the’ possession of, and residence on the reservation must-have existed at that time. Such residence being indispensable to the preservation of the title, it is clear that it must have-been absolutely necessary to its inception; and if the title to, the reservation did not commence as early as the first day of January, 1820, there is no subsequent period that can be fixed for its commencement.. It is not to be understood that the reservee must in person be on the land at that time, but that it must be his domicil, hjs place of abode.
5th. We think, therefore, that the judge was clearly right in telling the jury that, in order to acquire title, the larty must show that he was in possession of his reser *62 vation tbe first of January, 1820. . . , . , , , wrong in supposing tnat it would be But the court was sufficient to have been in possession by a tenant. If that were so, such possession might be continued by a tenant, the reservee and family removing at the same time from the land, and continuing to live at a distance from that, and from the habitation of civilized man. In, such case, all the objects of the treaty in allowing these reservations would be defeated. These objects need not be here again repeated. By relerence to what has been said, the conclusion is inevitable, that the treaty contemplated that the reservee should'be domiciled on the reservation the first day of January, 1S20, and whenever he voluntarily ceased to have his domicil there the land should be forfeited. As therefore, the court erred upon the first point discussed in this opinion, and as upon other points, there is conflicting testimony, so that we cannot determine what influence the error of the court had upon the jury, the judgment in these cases must be reversed, and the cause remanded for another trial.
Catron, Ch. J. concurred.